IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JEFFREY ELKINS,

          Defendant.

CRIMINAL CASE NO.

1:16-CR-002406-ELR-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Jeffrey Elkins' motion [Doc. 19] to suppress evidence seized from his vehicle, a silver 2002 BMW 745 LI ("BMW"), on January 13, 2015. The evidentiary hearing was held on January 18, 2017, on Defendant's motion to suppress.[1] [Doc. 33]. Defendant contends that the search warrant obtained on January 13, 2015, to support the search of the BMW, seized on January 11, 2015, lacked probable cause to search the BMW for and to seize the category of "[i]tems stolen from entering autos . . . ." Defendant also contends that the search warrant lacks a particularized description of the items to be seized. Finally, Defendant contends that the good faith exception to the exclusionary rule does not apply. [Docs. 19 & 23].

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

In response, the Government contends that Defendant lacked a reasonable expectation of privacy in the BMW at the time of the search having abandoned the vehicle by fleeing from the scene of the encounter with law enforcement, but that, if the court finds that Defendant did not abandon the BMW, the affidavit in support of the search warrant supplied probable cause to search for all of the items listed on the warrant and that the warrant's description of items to be seized was particularized or, in the alternative, that the good faith exception to the exclusionary rule does apply. The Government argues in the alternative that the automobile exception applies in this case negating the requirement for a search warrant or that the items found in the BMW would have been inevitably discovered. In order to support its arguments on abandonment and applicability of the good faith exception, the automobile exception and the inevitable discovery doctrine, the Government requested that an evidentiary hearing be set. [Doc. 28]. As noted, that hearing was held on January 18, 2017. [Doc. 33].

In the briefs filed following the hearing, the Defendant contends that he did not abandon the BMW, that the search warrant lacks probable cause and lacks the necessary particularity and that the good faith exception does not apply, and that the automobile exception and inevitable discovery doctrine do not apply. [Doc. 35]. In

2

response, the Government - on the grounds stated *supra* - opposes the motion to suppress.

After consideration of the arguments, record before the court and relevant legal authorities, the court finds that Defendant's motion [Doc. 19] to suppress evidence should be denied.

## I.    Background Facts

Alpharetta Police Department Detective ("Det.") Darryl Duval,[2] Criminal Investigation Division, testified at the evidentiary hearing about the events leading up to the seizure of Defendant Elkins' BMW and the search of that vehicle a couple of days later.  On January 11, 2015, around 7:00 p.m., a Sunday evening, Alpharetta Patrol Officer ("Off.") Kuo was conducting a patrol of various high end restaurants in Alpharetta due to the large number of entering auto crimes that occurred in the area. (Tr. at 6-7, 22-23).  Off. Kuo entered the rear parking lot of the Atlantic Seafood restaurant, 2345 Mansell Road, when he observed a person hanging out of (with his

---

[2]Det. Duval has been with the Alpharetta Police Department since June 2001 and previously served with the Bibb County Civil Court Sheriff's Office, December 1995 to June 2001, and with the Macon Police Department, May 1990 to December 1995. (Tr. at 5).  He stated that the offense of entering an automobile involved the unauthorized entry into a vehicle, whether secured or unsecured, with the intent to commit a theft and that he had handled hundreds of investigations involving this crime during his twenty-seven years of being a law enforcement officer.  (Tr. at 6).

feet dangling in the air) the right rear (passenger) window of a white Mazda SUV. Parked next to the Mazda, the officer observed a silver BMW (Defendant's vehicle), unoccupied but with the engine running and no headlights on. (Tr. at 7-8). The officer stopped his patrol vehicle and exited to approach the Mazda, and he observed shards of glass on the pavement and around the busted window frame of the Mazda. (Tr. at 8). As Off. Kuo identified himself and ordered the person to show his hands, the suspect exited the Mazda and looked towards the officer before fleeing the scene. (Tr. at 8).

Off. Kuo radioed for assistance giving a description of the suspect and gave chase on foot himself for a few minutes but was unable to catch the suspect; the individual was not apprehended that evening. (Tr. at 8-9). Off. Kuo returned to the BMW and Mazda. The front driver's door of the BMW was open with the key in the ignition. The officer observed shards of glass, with different tints, on the driver's area floorboard, a screwdriver on the front passenger seat, a plugged in cell phone and various other cables and cords on the console.[3] (Tr. at 10-11). The owner of the Mazda soon exited the restaurant and, after checking inside the vehicle, reported that

_____

[3]According to Det. Duval, the shards of glass with different tints found inside the BMW indicated that the source of the glass was at least two vehicles. (Tr. at 10, 41-42).

4

that nothing appeared to be missing. She had not authorized anyone to enter her vehicle. (Tr. at 11, 13). A short time later, a man exited the restaurant; he was the owner of a white Chevrolet Silverado parked near the Mazda. The right rear passenger window of the truck was also broken out in a manner similar to the Mazda's window. The truck owner reported that two Glock handguns and a range bag were missing from the truck. (Tr. at 13-14). Although on scene for approximately seventy minutes, no one claimed to be the owner of the BMW; and the officers believed that the BMW had been operated by the fleeing suspect. (Tr. at 13-15).

Off. Kuo, on the directions of his supervisor, began an impound sheet on the BMW and called for a wrecker to take the vehicle to the Alpharetta Police Department evidence building for further processing.[4] (Tr. at 7, 11-12, 22). The officer was

---

[4]As explained by Det. Duval, a different process is used for impounding a vehicle depending on whether the vehicle is part of an ongoing criminal investigation. (Tr. at 33-39). If the vehicle is being impounded only to be stored at the impound lot, then the impound sheet would be completed and an inventory of the vehicle completed. (Tr. at 33, 35-36). In this case, because the BMW was part of the ongoing entering auto investigation, Off. Kuo only started the impound sheet and did not conduct an inventory, and all of the copies of the sheet were left inside the BMW. Det. Duval completed the impound sheet, which included the items he seized when executing the search warrant. When the processing of the BMW was completed, Det. Duval left one copy of the impound sheet, a copy of the warrant, and evidence sheets in the BMW because the BMW was then towed to the impound lot for storage until Defendant claimed the vehicle. (Tr. at 21-22, 34-39; Def. Exhibit 1).

AO 72A
(Rev.8/82)

instructed not to enter the trunk of or to search the vehicle in order to avoid contamination of potential evidence, such as evidence that could lead to identifying the suspect. (Tr. at 12-13, 22). While on scene, Off. Kuo checked the tag on the BMW and determined that the vehicle belonged to Defendant Elkins. He also checked Defendant's history on the computer and determined that he had previously, in 2014, fled from an Alpharetta patrol officer conducting a traffic stop.

The next morning, January 12, 2015, Det. Duval began working on the case and spoke with Off. Kuo about his observations the night before. (Tr. at 7, 9, 17-18). The officer advised that he had not seen the face of the male who fled and could not identify him but that the suspect matched the height and weight information on Defendant's driver license. (Tr. at 16-17, 26-27). Based on the information provided, Det. Duval believed that Off. Kuo caught a person committing the offense of entering auto, the Mazda, and, when the officer identified himself, that the person fled. He also believed that the person had already broken into the Chevrolet Silverado. (Tr. at 10, 17-19). Based on his training and experience, the detective wanted to search the BMW because past investigations indicated that a suspect will commit multiple entering autos at more than one restaurant within the same time frame. When suspects are arrested, the detectives "recover items from several entering autos that are still inside the vehicle

6

at the time of arrest." (Tr. at 18-19).  In this case, Det. Duval stated that he believed that the two Glock handguns and range bag would be in the BMW and "possibly other items such as electronics, credit cards, . . . purses, . . . but the majority of items we do find are quick items[,] GPS, computers, laptops, handguns . . . ." (Tr. at 19, 31-32, 42).

The detective also stated that on Monday he conducted an inquiry of Defendant's criminal history.  Det. Duval was aware that Defendant was on probation for a 2013 conviction in Cobb County for entering auto.[5]  (Tr. at 15-16, 29-30).  One other incident was of note to the detective, that is, when Defendant fled in 2014 during a traffic stop for an improper u-turn on Haynes Bridge Road.  (Tr. at 19).  After handing the patrol officer his driver's license and registration, for no apparent reason, that is, he had a valid driver's license and there were no warrants and no visible impairment, Defendant fled in his vehicle southbound.  (Tr. at 19).  About thirty minutes later, two entering auto reports were received from the restaurant located at the place where Defendant had made the illegal u-turn.  (Tr. at 19-20).

---

[5]Later, after the search warrant was obtained, Det. Duval became aware that Defendant's two vehicles, the BMW and a Porsche Cayenne, were in various law enforcement data bases in connection with charges of entering autos.  (Tr. at 16, 29-30).

AO 72A
(Rev.8/82)

On January 13, 2015, Det. Duval applied for a search warrant for the BMW. He did not provide any additional information to the issuing judge not set forth in the warrant and accompanying affidavit. (Tr. at 20-21). The search warrant for the BMW sought, "Items stolen from entering autos including but not limited to any electronics, backpacks, handguns, credit cards, state identifications. Also any tools that could be used to make entry into a vehicle including but not limited to a screwdriver. Anything that may identify the suspect observed exiting the vehicle." [Doc. 28-1 ("Search Warrant")]. In support of the warrant, the detective swore to an affidavit containing the following information. On January 11, 2015, Off. Kuo was on patrol in the Atlantic Seafood parking lot regarding entering autos, and he observed "an unknown black male" leaning inside, through a broken rear passenger window, a Mazda parked in the rear lot. Glass fragments were on the ground and on the window frame. [Doc. 28-1 ("Affidavit") ¶¶ 1-2]. The Mazda was parked next to the BMW, which was running with no one inside and the doors were unlocked. [Id. ¶ 3]. When the officer approached the suspect, the suspect fled on foot and escaped. The BMW was transported to the police department. [Id. ¶¶ 4-5]. In plain view inside the BMW was a screwdriver located on the passenger side floorboard, which "is a tool consistent with

8

what appeared to have broken the rear window" of the Mazda.[6]  [Id. ¶¶ 6-7].  The officer also observed a plugged in cell phone and other charging type cords left on the console and unknown items were on the back seat.  [Id. ¶ 6].  Also, while the officer was impounding the vehicle, another victim approached and advised that his Chevrolet Silverado had been broken into and that a window "was also broken, with a tool, being used in the corner and popping the window."  [Id. ¶ 8].  Because the officer was told not to look in the BMW's trunk, it is not known what is inside.  [Id. ¶ 9].

Det. Duval stated that he included "stolen items" on the list of items to be seized because, as stated, if person travels twenty miles or more to commit an entering auto, "it's a good chance that they've committed another one on the way to our city, or they've committed other ones in our immediate area.  So [he] believe[d] that [he] would more than likely find other property inside that vehicle."  (Tr. at 21).  However, the detective confirmed that, at the time he obtained the search warrant, he did not have any specific information linking Defendant or the BMW to any other entering auto offenses near in time to January 11, 2015.  (Tr. at 29-30).

_____

[6]Det. Duval stated that he misstated the location of the screwdriver in the affidavit and that it was located on the passenger side front seat.  (Tr. at 40).

9

Det. Duval conducted the search on January 13, 2015, and found the two Glock handguns and the range bag, as well as an IPad mini and miscellaneous paperwork, that the truck owner had not realized on the evening of January 11, 2015, had also been stolen. [Doc. 28-1 ("Inventory")][7]; (Tr. at 31-32). Also located in the BMW were gift cards, Keno tickets, a diamond tennis bracelet, various electronics, fifty-eight one dollar bills, a screwdriver, a bottle with twenty-one oxycodone pills and a fur coat.[8]

After Defendant was identified as the suspect and because he was calling to inquire about the return of his BMW and cell phone, Det. Duval asked him to come to the police station to get his vehicle which had been released from the impound hold. (Tr. at 24). When the detective spoke with Defendant, Defendant claimed that he was not in possession of the BMW when the entering auto offenses occurred but that he had been carjacked earlier that day. Defendant speculated that the individuals who

---

[7]These items were all returned to the owner of the truck. [Inventory Items 1-5, p. 6 of 21 (CM/ECF numbering for Doc. 28-1)].

[8]The fur coat was apparently seized when the search warrant was executed; however, notes on the inventory sheet indicate that a pair of prescription glasses and assorted paperwork for a nail shop were seized later when those items, along with the fur coat, were reported stolen to the Gwinnett County Police Department. [Inventory Items 14, 15, 16, p. 8 of 21 (CM/ECF number for Doc. 28-1)]. Also, some of the miscellaneous gift cards, the diamond tennis bracelet and a Kodak camera were subsequently determined to be stolen by the Gwinnett County Police Department. [Id. 2, 4, 6, p. 7 of 21]; (Tr. at 32-33).

10

stole his BMW were responsible for the offenses. (Tr. at 24-45). Det. Duval did not believe Defendant's claim because he had not reported the carjacking to law enforcement authorities and never officially did so. (Tr. at 17, 42, 44). Also, when speaking with Defendant on two occasions about the incident, he gave inconsistent stories that did not make sense. Defendant also claimed that he had never been to Alpharetta and apparently had no explanation when the detective showed him the 2014 incident report that included his flight from the patrol officer. (Tr. at 42-43).

Additional facts will be set forth as necessary in discussion of the motions to suppress.

## II.    Discussion

Defendant seeks to suppress all of the evidence, with the exception of the screwdriver, seized from the search of the BMW on January 13, 2015. [Doc. 19]. The first issue for the court to address is whether at the time of the search Defendant had a legitimate expectation of privacy in the BMW to accord him standing to challenge the search of the vehicle. The court finds that the Government has established that Defendant abandoned the BMW and, therefore, cannot challenge the search.

AO 72A
(Rev.8/82)

### a.     Legitimate Expectation of Privacy

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989). It is each Defendant's burden to prove that he has a legitimate expectation of privacy in the BMW. See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000). Making this determination involves a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted). Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). Although Defendant as the registered owner and operator of the BMW had a legitimate expectation of privacy in the vehicle, his actions on January 11, 2015, and subsequent thereto establish that he had relinquished any reasonable expectation of privacy by the time of the search.

"Legitimate expectations of privacy can be abandoned." United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987). The question of abandonment is one of intent "which can be inferred from words, acts and other objective facts." Id. at 1546; and see United States v. Sparks, 806 F.3d 1323, 1342 (11th Cir. 2015) (this is an objective assessment "based primarily on the prior possessor's intent"). And "the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the 'strict property-right sense'" but is evaluated applying a "'common sen[s]e approach[.]'" Sparks, 806 F.3d at 1342 (citations omitted); and see United States v. Dyar, 574 F.2d 1385, 1390 (5th Cir. 1978)[9] ("Traditional or common law theories of property rights do not automatically confer standing to challenge a search[;]" "[p]roperty rights in absence of reasonable expectations of privacy in property cannot support a Fourth Amendment claim[.]"). "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*.'" McKennon, 814 F.2d at 1546 (quoting United States v. Pirolli, 673 F.2d 1200, 1204

---

[9]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(11th Cir. 1982)) (emphasis in original). In making this determination, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time." United States v. Winchester, 916 F.2d 601, 604 (11th Cir. 1990); accord United States v. Walker, 199 Fed. Appx. 884, 886 (11th Cir. 2006) (same). As noted, Defendant had the burden of establishing a legitimate expectation of privacy; however, the Government has the burden of proving abandonment. Walker, 199 Fed. Appx. at 886 (citing United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994)); and see United States v. Jefferson, 451 Fed. Appx. 833, 834 (11th Cir. 2011).

Defendant makes an unpersuasive, and legally unsupported, argument that privacy interests in a vehicle cannot be abandoned. [Doc. 35 at 9, 11-14]. Contrary to Defendant's argument, the Eleventh Circuit Court of Appeals and other courts in this circuit have concluded to the contrary on facts that are markedly similar to those before this court. See, e.g., United States v. Falsey, 566 Fed. Appx. 864, 867 (11th Cir. 2014) (finding that the defendant abandoned his BMW when, "believing that he was being pursued by the police, [he] sped into the parking lot of a business park and then sprinted into the woods, leaving his car unlocked with the key still inside of it" and concluding that the "'only conceivable purpose' for doing so was . . . to disassociate

14

himself from the vehicle and the [items] that were in it")[10]; <u>Jefferson</u>, 541 Fed. Appx. at 834 (affirming the district court's finding that the defendant abandoned his vehicle when, after struggling with the patrol officer during a lawful traffic stop, he fled the scene on foot);[11] <u>Hastamorir</u>, 881 F.2d at 1559-60 (finding that the defendant's disclaimers of ownership of the station wagon and its contents constituted abandonment); <u>United States v. Edwards</u>, 441 F.2d 749, 751-53 (5th Cir. 1971) (finding that the defendant's expectation of privacy in his car "came to an end when he abandoned his car to the police, on a public highway, with the engine running, keys in the ignition, lights on and fled on foot"); <u>United States v. Gaines</u>, 2011 WL 744658, at *3 (S.D. Ga. January 19, 2011) (finding that the defendant "forfeited any reasonable expectation of privacy with respect to the vehicle and its contents by fleeing from the police officers and abandoning his car"), <u>report and recommendation adopted by</u> 2011 WL 740728 (S.D. Ga. February 23, 2011).

---

[10]The court in <u>Falsey</u> cited to the decisions of a number of other courts of appeal also finding abandonment when a defendant left a vehicle either running or parked and unlocked and fled from the police on foot.  <u>Id.</u> at 867.

[11]<u>See</u> <u>United States v. Jefferson</u>, 2010 WL 3928049, at **5, 8 (N.D. Ga. May 25, 2010), <u>report and recommendation adopted by</u> 2010 WL 3927874, at *8 (N.D. Ga. October 4, 2010).  The magistrate judge in <u>Jefferson</u> also provided a lengthy list of decisions finding abandonment of a vehicle when a defendant fled leaving his vehicle.  <u>Id.</u>, at *8.

AO 72A
(Rev.8/82)

Likewise, in this case, Defendant abandoned any reasonable expectation of privacy in his BMW, which was parked at a restaurant as he committed the offense of entering auto because, when confronted by Off. Kuo, he fled the scene on foot - leaving the BMW running with the key in the ignition, no occupants and the door open.[12] (Tr. at 6-10, 14-15, 18). Furthermore, contrary to Defendant's attempt to heighten his expectation of privacy in his BMW, it is well established that there is a reduced expectation of privacy in a vehicle due to the extensive regulation of automobiles. See United States v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003); United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir. 1990); see also McKennon, 814 F.2d at 1543 (noting that no single factor is determinative and that the determination of whether a legitimate expectation of privacy exists depends on the totality of the circumstances, the court stated that the mere presence of ownership or financial interest in the object of the search is not sufficient to create a legitimate expectation of privacy).

---

[12]There is no evidence that, nor does Defendant argue that, abandonment of the BMW was involuntary or due to misconduct by Off. Kuo. See Jefferson, 2010 WL 3928049, at *5 ("'Courts[ ] have . . . found that abandonment may not be voluntary if it is merely the product of police misconduct.'") (quoting Pirolli, 673 F.2d at 1204). However, "'[t]he existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary.'" Id. (quoting United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973)).

16

And the court agrees with Det. Duval's assessment of Defendant's claim that the BMW was not in his possession on the evening of January 11, 2015, because he was allegedly carjacked earlier that day. (Tr. at 24-25, 42-44). Defendant's story is first undermined by the fact that he had not before the events on the evening of January 11, 2015, reported this crime to any law enforcement agency, and in fact, except for offering this explanation for why he was not involved in the entering auto crimes to Det. Duval, he never reported the carjacking officially to any law enforcement agency. (Tr. at 17, 24-25, 44). Additionally, the court finds it hard to believe that Defendant, who has a history of being involved in - and actually convicted of entering auto - just happened to be carjacked by individuals who used his BMW to commit entering auto offenses. (Tr. at 15-16, 19-20, 29-30). Most telling of what really happened on January 11, 2015, is Defendant's conduct in 2014 when he was pulled over on Haynes Bridge Road for the illegal u-turn and he fled. That incident was of note to Det. Duval. (Tr. at 19). As the detective testified, after handing the patrol officer his driver's license and registration, for no apparent reason, that is, he had a valid driver's license and there were no warrants and no visible impairment, Defendant fled in his vehicle southbound. (Tr. at 19). When about thirty minutes later two entering auto reports were received from the restaurant located at the place where Defendant had made the

illegal u-turn, the reasonable inference to be drawn is that, just like January 11, 2015, when caught in the commission of the crime, Defendant fled. (Tr. at 19-20). The court agrees with Det. Duval's assessment that Defendant's claim of being carjacked was just an attempt to distance himself from the entering auto offenses. (Tr. at 43). Defendant, also, clearly lied to Det. Duval when he claimed to have never before been in Alpharetta. (Tr. at 42-43). The court also notes that, although Off. Kuo is not able to identify the suspect who fled from him, Defendant does match the height and weight - as well as the sex - of that suspect. (Tr. at 8, 16-17, 26-27). The court finds that Defendant Elkins' "'only conceivable purpose'" for telling the carjacking story to Det. Duval was "to disassociate himself from the [BMW] and the [stolen items] that were in it." Falsey, 566 Fed. Appx. at 867.

For all of these reasons, the court finds that Defendant was present in the parking lot of the Atlantic Seafood restaurant the evening of January 11, 2015, and was observed by Off. Kuo hanging out of the rear window of the Mazda as his BMW, engine on and driver's door open, was parked nearby and that, when confronted, Defendant fled the scene on foot abandoning his BMW. Accordingly, Defendant did not have the requisite legitimate expectation of privacy in the BMW to challenge the search conducted on January 13, 2015. Defendant's motion should be denied on this

AO 72A
(Rev.8/82)

ground. However, even if Defendant did not abandon the BMW, his motion to suppress should be denied for the following reasons.

### b.    Automobile Exception to Search Warrant Requirement

The Government contends that Det. Duval had probable cause to search the BMW without a warrant pursuant to the automobile exception. [Doc. 28 at 19; Doc. 36 at 19-20]. Defendant argues that the detective lacked probable cause to search the BMW. [Doc. 35 at 16].

Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles. Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational"). No separate exigent circumstances need to be shown. See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); Watts, 329 F.3d at 1286 ("[T]his Court made it clear that the requirement of

19

exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning.") (quoting <u>United States v. Nixon</u>, 918 F.2d 895, 903 (11th Cir. 1990)) (internal quotation marks omitted; emphasis in original). The IBM was mobile, that is, operational, having obviously been driven to the restaurant and observed by Off. Kuo with the engine running.[13] (Tr. at 7-9, 13, 18).

The validity of the search, accordingly, turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. <u>Dyson</u>, 119 S. Ct. at 2014; <u>see also</u> <u>United States v. Lindsey</u>, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Magluta</u>, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted). The facts establish

---

[13]Although not raised by Defendant, the court notes that the search in this case is "reasonable if supported by probable cause, even [though] the vehicle [was] removed to the security of a police department lot" before the search two days later. <u>United States v. Santos</u>, 2012 WL 2061613, at *11 (N.D. Ga. April 24, 2012), <u>report and recommendation adopted by</u> 2012 WL 2062419 (N.D. Ga. June 7, 2012); <u>and see United States v. Jackson</u>, 548 F. Supp. 2d 1314, 1321-22 (M.D. Fla. 2008) (applying the automobile exception and finding that it was reasonable to move to the vehicle and search it the following day).

AO 72A
(Rev.8/82)

that Det. Duval had probable cause to search the BMW for evidence of the crime of entering an automobile.

The following facts support the search. The BMW, engine running and driver's door open, was parked next to the Mazda at the time Defendant was observed hanging out of the Mazda's broken rear passenger window. (Tr. at 7-9, 18). There were broken shards of glass on the ground and remaining in the window frame of the Mazda. (Tr. at 8). Off. Kuo reasonably concluded that Defendant was committing the crime of entering auto. When confronted by Off. Kuo, Defendant exited the Mazda and, after a brief hesitation, fled the scene.[14] (Tr. at 8). Inside the BMW, in plain view, Off. Kuo - and subsequently Det. Duval - observed more shards of glass of differing tints, along with a screwdriver which appeared to be the tool used to break the windows of the Mazda and a Chevrolet Silverado parked nearby. (Tr. at 10-11, 14). The shards of glass indicated to Det. Duval that more than one vehicle had been broken into. (Tr. at 41-42). A cell phone, plugged in, was also left on the console of the BMW and other unidentified items were on the backseat. (Tr. at 11). Although no items appeared to

_____

[14]"[F]light in vehicle and on foot contributed to finding of probable cause to search vehicle[.]" United States v. Adigun, 2011 WL 2194253, at *14 (N.D. Ga. May 4, 2011) (citing United States v. Rodriguez-Alvarado, 510 F.2d 1063, 1064 (9th Cir. 1975)), report and recommendation adopted by 2011 WL 2198308 (N.D. Ga. June 3, 2011).

AO 72A
(Rev.8/82)

be missing from the Mazda, the owner of the Silverado reported that two Glock handguns and a range bag were missing from his truck which the detective believed would be found in the BMW, since Defendant fled the scene without anything in his hands. (Tr. at 13-14). Both Off. Kuo and Det. Duval, based on these facts, believed that Defendant had driven the BMW to the location of the crimes and then fled when caught in the act. (Tr. at 13, 15, 18).

Det. Duval, based on his experience as a law enforcement officer handling hundreds of entering auto investigations, drew the reasonable inference that, besides the screwdriver and the two Glock handguns and range bag, additional evidence of the crime of entering auto would be found in the BMW. See United States v. Reed, 402 Fed. Appx. 413, 415 (11th Cir. 2010) ("In making these commonsense judgments, '[t]he . . . officer is expected to assess the facts in light of his professional experience . . . .'") (citation omitted); United States v. Knight, 336 Fed. Appx. 900, 902 (11th Cir. 2009) ("Great deference is given to the judgment of trained law enforcement officers on the scene.") (citations and internal quotation marks omitted); United States v. Robinson, 62 F.3d 1325, 1331 & n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents regarding facts are properly considered in determining probable cause). As he stated, when suspects are arrested, the detectives "recover items from

22

several entering autos that are still inside the vehicle at the time of arrest." (Tr. at 5-6, 18-19, 28-29). In this case, Det. Duval stated that he believed that the two Glock handguns and range bag would be in the BMW and "possibly other items such as electronics, credit cards, . . . purses, . . . but the majority of items we do find are quick items[,] GPS, computers, laptops, handguns . . . ." (Tr. at 19, 31-32, 42). Defendant's criminal history lent support to the detective's conclusion that Defendant used his vehicles to facilitate his criminal conduct. Before the search, the detective knew that Defendant was on probation for a Cobb County conviction for entering auto and, as discussed *supra*, that Defendant had fled, for no apparent reason, from a patrol officer after being stopped for a traffic violation occurring at the site of and close in time to two reported entering auto offenses. (Tr. at 15-16, 19-20, 29-30).

Based on these facts and the reasonable inferences drawn from the facts based on Det. Duval's experience, the court finds that there was "a fair probability that contraband or evidence of [the] crime [of entering auto would] be found in [the BMW]" - that is, that there was a nexus between the BMW and the crime of entering auto. Magluta, 418 F.3d at 1182; and see United States v. Alston, 598 Fed. Appx. 730, 734 (11th Cir. 2015) (finding probable cause to search a vehicle used to facilitate the criminal offense of drug-trafficking to search for "additional evidence of drug-

23

trafficking activity, such as drug paraphernalia, cash, or records of drug transactions, among other things"). Even without considering his belief that other items would be found in the BMW, because Det. Duval knew that a tool used to commit the crime, the screwdriver, and reasonably believed that the handguns and range bag were in the BMW, he could search in the vehicle in any areas or compartments where either tools used in commission of entering auto or firearms might be found. See Alston, 598 Fed. Appx. at 734; and see Wyoming v. Houghton, 119 S. Ct. 1297, 1301 (1999) ("'If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search.'") (citation omitted; emphasis in original). And the detective was authorized to seize any items observed during that search that he reasonably believed, based on his training and experience, constituted evidence of or fruits of the crime of entering auto, such as, the electronics, jewelry, clothing, gift cards and the other paperwork he seized.[15] (Tr. at 18-19, 21, 31-33).

---

[15]The detective's reasonable belief was borne out by subsequent events when the laptop belonging to the Silverado's owner, which he had not noticed was missing, was found in the BMW and when other electronics, clothing, jewelry and other items were discovered to have been stolen. (Tr. at 31-33); [Inventory Items 1-5, p. 6 of 21; Inventory Items 2, 4, 6, p. 7 of 21; Inventory Items 14-16, p. 8 of 21].

24

For these reasons, the court finds that Det. Duval was authorized to conduct a warrantless search of the BMW pursuant to the automobile exception and that, therefore, Defendant's motion to suppress the fruits of that search should be denied.[16]

---

[16]The Government also contends that the inevitable discovery doctrine is applicable to this case in an argument that at times seems to conflate the automobile exception with that doctrine. [Doc. 28 at 17-19; Doc. 36 at 19-21]. The court will not rely on that doctrine in this case. "Under the inevitable discovery exception to the exclusionary rule, evidence obtained unlawfully may be admissible if the government can establish by a preponderance of the evidence that it ultimately or inevitably would have been discovered by lawful means." United States v. Norman, 638 Fed. Appx. 934, 937 (11th Cir. 2006) (citation omitted). "[I]n order to establish inevitable discovery the prosecution must show that the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred." United States v. Khoury, 901 F.2d 948, 960 (11th Cir.), mod'd on other grounds, 910 F.2d 713 (11th Cir. 1990). In United States v. Johnson, 777 F.3d 1270 (11th Cir. 2015), the Eleventh Circuit Court of Appeals explained the requirement of "active pursuit" stating that "'[a]ctive pursuit' does not require that police have already planned the particular search that would obtain the evidence." Id. at 1274-75 ("the purpose of the requirement of active pursuit is to exclude evidence that was not being sought in any fashion"). "The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" Id. at 1274 (citation omitted). Apparently, the Government contends that the items seized would have been discovered when the BMW was processed for evidence, such as, being dusted for fingerprints by a forensic investigator, and would have been inventoried. [Doc. 36 at 20]. The problem with the Government's argument is that, besides a statement by Det. Duval about treating the BMW as evidence and not needing a warrant and a general discussion about normal impound procedures, nothing in the record establishes the process for collection of evidence when, for example, a vehicle is being dusted for fingerprints, or provides the policy for inventory searches under those circumstances. (Tr. at 11-13, 21-22, 35, 37-38).

AO 72A
(Rev.8/82)

### c. Search Warrant

Although the court has determined that a search warrant was not necessary, the detective applied for and obtained a search warrant for the BMW on January 13, 2015. See United States v. Haces-Delgado, 2010 WL 4639229, at *3 (N.D. Ga. September 15, 2010) (although officers obtained a search warrant for the vehicle, because there was probable cause for the search, the warrant was not needed); Jackson, 548 F. Supp. 2d at 1325-26 (same). Defendant contends that the affidavit failed to establish probable cause to search for the list of stolen items, and he contends that the list of stolen items and identification related items set forth on the warrant lack the particularity necessary to avoid authorizing a general search. [Doc. 23 at 2-6; Doc. 35 at 7-8]. Defendant also argues that the good faith exception does not apply in this case. [Doc. 23 at 6-8; Doc. 35 at 8-9]. In response, the Government contends that the affidavit establishes probable cause to search for stolen items in the vehicle and that the list of items to be seized is sufficiently particularized. The Government also, relying in part on evidence presented at the hearing, argues that the good faith exception to the exclusionary rule is applicable to this case. [Doc. 28 at 7-17; Doc. 36 at 10-19].

26

The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted). In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329). For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same). In reviewing the issuance of the search warrant, the undersigned must determine only that the issuing judge had

a "substantial basis" for concluding that probable cause existed to uphold the warrant based on the totality of the circumstances presented in the affidavit. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam); Brundidge, 170 F.3d at 1352.

## 1. Probable Cause

To be sufficient, "the affidavit need only establish a nexus between the criminal activity and the [BMW]." Haces-Delgado, 2010 WL 4639229, at *3. Discussing probable cause to search a vehicle, the court in United States v. Benavides-Garcia, 2011 WL 1740177 (N.D. Ga. March 29, 2011), report and recommendation adopted by 2011 WL 1695025 (N.D. Ga. May 5, 2011), stated, "'[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation.'" Id., at *14 (citation omitted); see also United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (noting that while an affidavit must establish a link between the defendant and the residence to be searched as well as between the residence and criminal activity, "[t]here need not be an allegation that the illegal activity occurred at the location to be searched . . ."). The affidavit need not contain direct evidence that items stolen from the Mazda, the Silverado or other vehicles are located in the BMW.

28

The affidavit in support of the search warrant to seize "[i]tems stolen from entering autos including but not limited to any electronics, backpacks, handguns, credit cards, state identifications . . ." [Search Warrant] set forth the following facts. On January 11, 2015, Off. Kuo was on patrol in the Atlantic Seafood parking lot regarding entering autos, and he observed "an unknown black male" leaning inside, through a broken rear passenger window, a Mazda parked in the rear lot. Glass fragments were on the ground and on the window frame. [Affidavit ¶¶ 1-2]. The Mazda was parked next to the BMW, which was running with no one inside and the doors were unlocked. [Id. ¶ 3]. When the officer approached the suspect, the suspect fled on foot and escaped. The BMW was transported to the police department. [Id. ¶¶ 4-5]. In plain view inside the BMW was a screwdriver located on the passenger side floorboard, which "is a tool consistent with what appeared to have broken the rear window" of the Mazda. [Id. ¶¶ 6-7]. The officer also observed a plugged in cell phone and other charging type cords left on the console and unknown items were on the back seat. [Id. ¶ 6]. Also, while the officer was impounding the vehicle, another victim approached and advised that his Chevrolet Silverado had been broken into and that a window "was also broken, with a tool, being used in the corner and popping the window." [Id. ¶ 8].

29

Because the officer was told not to look in the BMW's trunk, it is not known what is inside. [Id. ¶ 9].

These facts clearly established a nexus between the BMW and the crime of entering an automobile, especially, in light of the fact that a tool, the screwdriver which was likely used in the crime, was observed in the BMW. The court also finds that Defendant's flight, as already discussed, is indicia of probable cause that the apparent operator of the vehicle was engaged in criminal activity and attempted to disassociate himself from the BMW and its contents. See Falsey, 566 Fed. Appx. at 867; Adigun, 2011 WL 2194253, at *14. And the court finds that it would have been reasonable for the judge reviewing and issuing the warrant to have inferred that any items stolen in course of Defendant's criminal activity that evening would have been stored in the BMW, the only location available. See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted). Accordingly, "[w]here[, as in this case,] a 'common sense and realisitic'

30

interpretation of the affidavit supports a reasonable likelihood that evidence of a crime might be found in a particular place, probable cause is not lacking." <u>Adigun</u>, 2011 WL 2194253, at *14 (citation omitted).

The court finds that there was probable cause set forth in the affidavit to search the BMW for items stolen from entering autos.

## 2. Particularity

"'Particularity is the requirement that the warrant must clearly state what is sought.'" <u>United States v. Maali</u>, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (citation omitted). Although "[a] description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized[,]" <u>United States v. Wuagneux</u>, 683 F.2d 1343, 1348 (11th Cir. 1982), the particularity requirement must be enforced to avoid undermining the warrant requirement and to decrease the risk of allowing excessive intrusion into personal rights protected by the Fourth Amendment, <u>id.</u> at 1348-49. <u>See also</u> <u>United States v. Thornhill</u>, 20 F. Supp. 2d 1377, 1379 (M.D. Ga. 1998) ("Elaborate specificity in a warrant is not necessary. A description is sufficiently particular when it enables a searcher to reasonably ascertain and identify the items authorized to be seized.").

31

However, because the circumstances of an investigation "often make an exact description impossible[, ]. . . the judicial officer issuing the warrant must weigh the practical necessities of law enforcement against the likelihood of a violation of personal rights of the one whose possessions are to be searched." United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985) (citing United States v. Cook, 657 F.2d 730, 733 (5th Cir. Unit A 1981)). In this regard, "[i]t is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." Wuagneux, 683 F.2d at 1349.

Defendant contends that the descriptions, "Items stolen from entering autos including but not limited to any electronics, backpacks, handguns, credit cards, state identifications" and "Anything that may identify the suspect observed exiting the vehicle" [Search Warrant], lacked the required particularity. Although the descriptions might have been more narrowly drawn, under the circumstances, especially that the warrant authorized the search of the limited space of the BMW and not, for example, a personal residence, the court finds that the warrant did not authorize a general rummaging in the BMW. With respect to the description of the stolen items, this

32

phrase does not stand alone but is modified by the phrase "from entering autos" and by providing a listing of the type of items that might fall within that limitation. The phrase is also restricted to looking for evidence pertaining to violation of O.C.G.A. § 16-8-18, that is, entering autos. [Search Warrant]. See United States v. Strauss, 678 F.2d 886, 892 (11th Cir. 1982) (finding that list of items sought, "including a blue and white Chevrolet Motor truck with dual rear wheels; a GMC mobile home; an Itasca motor home; related registration, ownership and identification documents and markings; and *other stolen property*" provided a description "precise enough to prevent a general search") (citation not provided and internal quotation marks omitted; emphasis added); United States v. Brown, 2008 WL 2356344, at *4 (S.D. Ga. June 9, 2008) (the court rejected the defendant's challenge to the particularity of the search warrant's description of items to be seized, which included the phrase "'*or any other criminal offense*[,]'" finding that the phrase "did not provide carte blanche for the executing officers to rummage aimlessly through [the defendant's] belongings" because "[o]ther language in the warrant allowed the officers to conduct a thorough search of [the defendant's] residence for '*evidence related to the crime of armed robbery*,' including firearms and ammunition, writings and photographs, disguises, and fruits of the crime" and implicitly upholding the latter description as being sufficiently

33

particular) (citations omitted; first emphasis in the original; second emphasis added). The warrant restricted Det. Duval to searching for items stolen from entering autos and did not permit a general search.

And the phrase, "Anything that may identify the suspect observed exiting the vehicle[,]" did not permit a general rummaging through the BMW. In <u>United States v. Lisbon</u>, 835 F. Supp. 2d 1329 (N.D. Ga. 2011), the court examined a challenge to similar language in a search warrant for a residence. In that case, after listing a number of items, the warrant authorized the search for "[i]ndicia of identity and/or occupancy, such as identification documents and mail." <u>Id.</u> at 1345. Defendant contended that the term "identification documents and mail" lacked particularity. <u>Id.</u> at 1346. The court, noting that the term modified authorization to search for "[i]ndicia of identity and/or occupancy" and was "limited to evidence related to the investigation . . . of violations of 21 U.S.C. §§ 841 and 846[,]" rejected the defendant's challenge. <u>Id.</u> As the court stated, "'A search warrant may be used, not only to gather evidence of a criminal activity, but also to gather evidence of who controlled the premises suspected of connection with criminal acts.'" <u>Id.</u> (citation omitted). The court held that the "executing agents were therefore given sufficient direction in executing the warrant and as a result, the warrant did not offend the particularity requirement of the Fourth

34

Amendment." Id. Likewise in this case, the warrant authorized Det. Duval to search for evidence of who was in control of the BMW, that is, evidence that might "identify the suspect observed exiting the vehicle" at the time of the offense, and specifically identified the offense in question, entering autos. [Search Warrant]. This language did not authorize a general, unrestricted search.

### 3. Good Faith

Finally, the court finds that the good faith exception to the exclusionary rule is applicable to this case. In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective. In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably

presume it to be valid[,]" the good faith exception applies.  Id. at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'"[17]  Id. at 1480 (quoting Leon, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  Id. at 1481.

Defendant's contention that the good faith exception does not apply due to lack of probable cause falls within the third exception, that is, that the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'"  Leon, 104 S. Ct. at 3421 (citation omitted).  The court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine.  See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998).  The affidavit provided factual details for the issuing judge to consider and evaluate.

---

[17]As the court determined *supra*, the affiant did not intentionally or with deliberate recklessness omit material information from the affidavit.

Defendant also contends that the good faith exception does not apply because "[t]he warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid." United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000) (citing Accardo, 749 F.2d at 1481) ("The question here is not the legal validity of the warrant but the reasonableness of the officers' reliance on it. This is not an instance in which 'it is plainly evident that a magistrate or judge had no business issuing a warrant[.]'") (quoting Sheppard, 104 S. Ct. at 3429 & n.7). The Eleventh Circuit Court of Appeals has held that the good faith exception to the exclusionary rule applies to alleged violations of the particularity requirement. See Accardo, 749 F.2d at 1479-1481. The Eleventh Circuit, citing Accardo, affirmed that the good faith exception may be applied to an overly broad warrant. Travers, 233 F.3d at 1330 (citing Accardo, 749 F.2d at 1481). As discussed, the search warrant does not allow a general search of the BMW. Moreover, the totality of the circumstances surrounding issuance of and execution of the search warrant results in a finding that Det. Duval reasonably relied on and acted on the judge's decision to authorize the search. Accardo, 749 F.2d at 1481.

AO 72A
(Rev.8/82)

In <u>United States v. Martin</u>, 297 F.3d 1308 (11th Cir. 2002), the Eleventh Circuit Court of Appeals explored what information was encompassed by the term "totality of the circumstances." The court held "that [it] could look beyond the four corners of the affidavit and search warrant to determine whether [the affiant/executing officer] reasonably relied upon the warrant." <u>Id.</u> at 1318. This information includes facts known to the affiant "that were not included in the affidavit." <u>Id.</u> at 1319. In <u>Martin</u>, the court noted that facts omitted from the affidavit[18] but known the affiant included that he consulted with the district attorney before obtaining the warrant, that he corroborated as much information as possible about the defendant, and that he examined facts to ensure information in the affidavit was not stale. <u>Id.</u> at 1319-20. The court held, "Under the totality of the circumstances, taking into account the facts known to [the affiant] at the time he applied for the search warrant, we find that [the affiant] reasonably believed that probable cause existed to execute a search warrant." <u>Id.</u> The decision in <u>Martin</u> has been extended to considering information known to the affiant, but not included in the affidavit or on the face of the warrant, to apply to the

---

[18]The court also noted that, the affiant "did not intentionally omit facts that would have defeated a finding of probable cause. On the contrary, the facts that [the affiant] omitted in his affidavit (i.e., specific dates and times) would have only further supported the issuance of the warrant." <u>Id.</u> at 1320.

particularity requirement.  See United States v. Collins, 2016 WL 1639960, at *18

(N.D. Ga. February 9, 2016) (looking to both the affidavit and police reports in

evidence at the hearing to support seizure of items allegedly not described with

sufficient particularity in the warrant), report and recommendation adopted by 2016

WL 1623910 (N.D. Ga. April 25, 2016); United States v. Kilgore, 2012 WL 5334298,

at **8-9 (N.D. Ga. September 13, 2012) (rejecting the defendant's over breadth

challenge to the list of items to be seized incorporating "all aspects of a drug

trafficking operation" even though the affidavit did not specifically allege facts

supporting such a conclusion because the officers had knowledge, not included in the

affidavit, "of previous complaints about [the defendant's] drug-related activities at [the

defendant's] residence"), report and recommendation adopted by 2012 WL 5305146

(N.D. Ga. October 26, 2012).

If in doubt, Det. Duval's testimony at the evidentiary hearing further supports

a finding of probable cause to seize the "[i]tems stolen from entering autos" and

establishes that the particularity requirement is sufficiently met to apply the good faith

exception in both instances to this case.  As noted *supra*, the detective is an

experienced law enforcement officer who has investigated hundreds of entering auto

cases.  (Tr. at 5-6).  Based on that training and experience, the detective wanted to

search the BMW because past investigations indicate that a suspect will commit multiple entering autos at more than one restaurant within the same time frame. And he was aware that when suspects are arrested, the detectives "recover items from several entering autos that are still inside the vehicle at the time of arrest." (Tr. at 18-19, 21). In this case, Det. Duval had facts to back up that belief because both the Mazda and Silverado had been broken into and there were shards of glass, of differing tints, on the driver's side floorboard of the BMW. (Tr. at 8, 10-11, 14, 41-42). The detective was also aware that two Glock handguns and the range bag were stolen from the Silverado - items that are referenced on the face of the warrant. (Tr. at 14, 18). He testified that he believed the two Glock handguns and range bag would be in the BMW and "possibly other items such as electronics, credit cards, . . . purses, . . . but the majority of items we do find are quick items[,] GPS, computers, laptops, handguns . . . ." (Tr. at 19, 29, 31-32, 42). The detective testified that he seized items from the BMW because he suspected that they had been stolen at another place and time. (Tr. at 32). Additionally, the detective investigated Defendant's background and was aware that he was on probation in Cobb County for an entering auto conviction and that he had fled from the scene of traffic stop in Alpharetta in 2014 under circumstances resulting in the reasonable inference that Defendant had just committed two entering

40

auto offenses. (Tr. at 15-16, 19-20, 29-30). Accordingly, Det. Duval was aware that the incident on January 11, 2015, was not an isolated event.

These additional facts, along with the information contained in the affidavit, do *not* support a finding that "a reasonably well-trained officer[, such as Det. Duval,] would have known that the search was illegal despite the judge's authorization[.]" Martin, 297 F.3d at 1320. The court in Martin stated, "The exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause." Id. As the court in Martin concluded, "This is not the case here." Id. Det. Duval was, therefore, entitled to rely upon the judge's evaluation and determination that "given all the circumstances set forth in the affidavit before [the judge], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 103 S. Ct. at 2332. The good faith exception applies, and, even if the search warrant is found lacking, the exclusionary rule of the Fourth Amendment does not apply.

For all of these reasons, the court recommends that Defendant's motion to suppress evidence be denied.

41

## III.   Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motion [Doc. 19] to suppress evidence be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 13th day of April, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)